AUSTIN *v.* DERMOTT CANNING COMPANY.

Opinion delivered January 19, 1931.

*Cook & Trice,* for appellant.

*Golden & Golden, John Baxter* and *Rowell & Alexander,* for appellee.

MEHAFFY, J. Lowry Austin and forty-five other farmers brought suit in the Chicot Chancery Court to recover $3,659.29 due them collectively for string beans which they, under written contract, produced during the year 1928 for the Dermott Canning Company.

Judgment was asked against the Dermott Canning Company and C. R. Bates, C. B. Bowman, L. F. Bellingrath, M. C. Magness, R. W. Marks, W. A. Daniels, and W. F. Akin, as directors of the canning company. The articles of association of the Dermott Canning Company were filed May 27, 1927. The certificate showed that $20,000 capital stock had been paid in cash.

The Exchange Bank & Trust Company is the legal successor of the Bank of Dermott, and when the banks were merged, the Exchange Bank & Trust Company took over all the assets and assumed the liabilities of the Bank of Dermott.

The contract the appellants made was in the spring of 1928. They produced and delivered the beans under the contract for which they have not been paid.

W. L. Akin was president of the canning company and M. C. Magness was secretary, and appellants seek to recover against them for failure to file the annual statement required by the provisions of § 1715 of C. & M. Digest. The canning company borrowed money from the banks and executed a mortgage on all the property, and appellants contended that the vice-president and secretary, who executed the mortgage, had no authority from the directors, and for that reason the mortgage was void.

It is also contended by appellants that the canning company, while insolvent, preferred the two banks over the other creditors, and contended that they were entitled to share in the distribution of the money paid to the banks.

Lowry Austin, one of the appellants, testified in substance that he knew a little about the organization of the canning company, having been present at a meeting when the matter of organizing the company was discussed. He did not know who the incorporators were; signed a contract to grow beans in 1928 on the printed form of the company, and delivered his last beans in July, 1928; talked to Mr. Magness, secretary and treasurer of the canning company about payment, and Mr. Magness said he would be paid; made his last demand for payment in August, after the factory had shut down.

Mr. Magness made a talk at the church and stated that he wanted the people to understand that, if they would be still until the beans were canned and sold, the company would pay all claims, and this satisfied witness. Witness did not know what was done with the bean

money except what Magness said. Magness said he turned the money over to the Exchange Bank & Trust Company. Magness did not say what the money was turned over to the bank for. Witness understood that Akin was president of the company and that Bowman was vice-president. Magness was cashier of the Bank of Dermott. Witness was not advised that the company was insolvent when he delivered his beans. Witness and others believed that, as soon as the beans were sold, they would get paid. He never solicited the banks to furnish money to the canning company to buy beans. He never understood that the banks were to be repaid before he was paid, but was made to understand that, as soon as the beans were sold, he would be paid; heard Magness say in the meeting there was 28,000 or 30,000 cases of beans on hand, and if they sold anything like they did the year before there would be enough to pay all the growers; that, if the people would be patient, they would get their money. Witness met Akin at a meeting, and Akin made a talk discussing the canning factory. About all he talked about was his ability to sell the goods if they would go ahead and get the factory. Akin came down to discuss the advisability of a canning plant for Dermott; did not hear him say on what conditions he would move his factory to Dermott. The meeting was before the 1927 flood. Witness did not subscribe for any stock; heard it talked that Akin would bring some junk down if the people would subscribe the stock; did not know that the canning company was having trouble financing itself. Did not know that Mr. Akin had fallen down on the financing. Magness said it was working him to death to keep enough money to pay off.

Guy Courtney testified that he is one of the plaintiffs, that he grew beans for the canning company, and never solicited either of the banks to furnish money to the canning company. He did not have anything to do with the organization of the canning company. He planted beans because Mr. Magness asked him to; did not

know who the directors of the canning company were; had never heard of the move on the part of the farmers to get the plant located at Dermott. It was gotten up by the people of Dermott. Mr. Magness told him there would be plenty to pay everybody. Magness never told witness anything about the banks having a big debt against the canning company. He could not find out anything, and after he had tried for about thirty days he employed lawyers to file suit.

J. B. Griswood testified that he grew beans for the canning company in 1928, for which he had not been paid. During the canning season the canning plant employed from 50 to 150 hands. Witness attended the chamber of commerce meeting in 1927 when Mr. Akin discussed the canning plant and heard Mr. Akin say how it was to be handled. Akin said he could finance the scheme if the people of Dermott would subscribe some capital stock. Akin further said that he had fifteen plants and one of them was off the railroad, and he would move it to Dermott. Witness was not told that he was to get his money first. He was assured several different times that he would get his money. He did not know how much was advanced by the banks nor what the beans sold for. Magness told him he would get his money.

S. G. Lockhart, cashier of the Exchange Bank & Trust Company, testified that in the merger of the two banks his bank took over the debts and assets of the Bank of Dermott. Magness was cashier of the Bank of Dermott. The Exchange Bank & Trust Company loaned the Dermott Canning Company approximately $11,000. Some of it was loaned in 1927 and some in 1928. The canning company was indebted to the bank at the beginning of 1928 probably $2,000. The People's Lumber Company was planning to file a lien, and the bank furnished the money to pay off this lien; that is, furnished a part and the other bank furnished a part. The bank furnished the canning company money to buy bean seed to plant, and after the beans were canned the bank was secured by

warehouse receipts. The receipts were delivered some-time after the money was furnished. The money furnished by the bank in 1928 to buy beans and cans and to buy off a lien was $11,000. The lien was about $2,400. Both banks had been paid in full by the canning company except $2,018. Witness did not know what became of the bank statements of the canning company. The debt of $2,018 is secured by a mortgage and is past due.

C. W. Carlisle, a bookkeeper, testified that he had examined the records of the canning company on file with the chancery clerk, and that they were incomplete and jumbled up. The bank statements for 1928 and 1929 were not among the papers. The stock book of the canning company showed that 83 certificates had been issued for 729 shares at $25 per share. The total of all the certificates was $18,225. The tickets at the clerk's office aggregated 278,998 pounds. The labor tickets for 1928 totaled $4,432.

Did not see any minute book authorizing vice-president and secretary of the canning company to execute a mortgage. Witness' testimony was based on records filed in the clerk's office.

J. B. Coburn, superintendent of the canning factory of the Drew County Cottonseed Oil Mill Company at Monticello, testified that 278,998 pounds of green beans would make about 33,620 cases of canned beans, and that the prevailing prices for canned beans from May to July, 1928, were from 85 cents to $1.20 per dozen cans, which price would include brokerage and discount. The plant at Monticello was a going concern. It failed the first year because it was a promotion scheme, organized for $5,000, with $2,400 paid in, out of which it had to buy and equip the factory and pay for the products. Then the drouth came and the crops were poor. Witness understood that his company didn't borrow money the last year of its operation but did before that. When a canning company is short of money, it is customary for it to warehouse its products.

M. C. Magness, former cashier of the Bank of Dermott, and former secretary and treasurer of the Dermott Canning Company, testified that he met Mr. Akin when the proposition for a canning plant was started, and that Akin, at a meeting, outlined a proposition to establish a canning plant at Dermott. Akin said he had had a number of years' experience and that he had a plant he would like to bring to Dermott; that he wanted the local people interested but he wanted control of the stock; said that his machinery was worth $15,000. A committee was appointed to look into the proposition, and thereafter there were other meetings, and the canning factory was incorporated. Mr. Akin was to furnish the machinery at $15,000; the other money was to be raised locally; witness was one of the original incorporators; the capital stock was $20,000, and that amount of money, or its value, was put into the corporation. Akin had a plan for financing the proposition which he submitted to the chamber of commerce. The canning company lost some lumber in the 1927 flood. After the flood in 1927, the factory operated and did a small amount of business. A mortgage was given to the Exchange Bank and the Bank of Dermott in April, 1928, securing a debt of $2,000 to each bank.

The canning company erected a building. It was not paid for, and the People's Lumber Company filed suit to enforce its lien for something like $2,300. The balance of the $4,000 represented money to buy bean seed for the year 1928. Akin got into financial difficulties, and after a lot of trouble witness and others got a bonding company to bond the warehouse so that the company could hypothecate warehouse receipts.

The beans were bought from the farmers, and they were given bean tickets. Quite a lot of beans spoiled. The receipts were handled just like cotton compress receipts. When the beans were sold, the banks would be paid equally. The borrowed money was used to pay everything but the farmers. Numbers of them came to

see witness; the banks knew that the farmers had not been paid, but the banks had warehouse receipts and when the beans were sold the money went to pay the banks.

Akin valued his machinery at $15,000 and gave assurance that it was worth that money. The directors did not undertake to ascertain the value; could not produce the records showing what the 1928 crop brought; kept a minute book, but it was with the records; thought the stock book was properly kept. Akin was to get $10,200 stock, and he testified that the audit made by Rebsamen, Brown & Company would reflect the truth better than he could from memory; told the farmers that if they would be quiet and wait they would get their money, but that the banks would have to be paid first; knew before the beans were sold that the company was insolvent; borrowed some money from the banks to can beans; cans were bought in carload lots $1,400 to $1,800 per carload. Witness admitted that neither he nor the president ever filed an annual statement.

John Baxter testified that he wrote the articles of incorporation; that Akin's stock was valued at $15,000, but Akin only wanted $10,200. Parties around Dermott subscribed and paid for $6,475. If it had all been paid in and the machinery valued correctly, there would have been $25,000 capital stock and surplus. Akin subscribed $17,500 and paid in $2,500 cash. Akin did not pay anything for his capital stock except his machinery and what other folks put in. The Arkansas Power & Light Company had $750.

L. F. Bellingrath testified that he lived in Pine Bluff and was interested in the Coca Cola business with a distributing plant at Dermott, where he owned real estate. Subscribed and paid for $500 stock in the canning company.

C. B. Bowman testified that he lived in Dermott in 1927; attended the meetings when Akin spoke and explained the canning company and situation. He paid $1,000 for stock and had the stock issued to the Dermott Grocery Company.

Board of directors accepted Akin's word after investigating and considering the matter thoroughly; offered to sell the machinery for considerably less than $15,000.

Appellants' first contention is that the directors are liable upon their certificates as to the amount of the capital stock. They rely on § 1711 of C. & M. Digest and the decisions of this court construing this section. This section among other things provides that the president and directors thereof shall file the articles of association and also certificates setting forth the purposes for which such corporation is formed, the amount of its capital stock, the amount actually paid in, and the names of the stockholders and the number of shares by each respectively owned, with the county clerk of the county in which the corporation is to have its principal place of business.

Section 8 of article 12 of the Constitution of Arkansas provides: ''No private corporation shall issue stocks or bonds except for money or property actually received or labor done,'' etc. It will be observed that the Constitution permits the issue of stocks for money, property, or labor done.

In the first case referred to by appellant, the court said: ''The defendants knew that the certificate made and filed by them was false when they signed it. They did not know or have reason to believe that shares of stock were paid as they certified. The shares certified to be paid included their own shares, and they knew that they or any part thereof were not paid at the time the certificate was made. It was confidently believed that the shares subscribed would be paid, and in belief of that fact they filed the certificate. But good faith is not equivalent to acts done. The shares certified were not taken or paid when the certificate was made. The evidence shows that defendants intentionally neglected to file the certificate required by the statute.'' *O'Neil* v. *Eagle Generator Co.*, 92 Ark. 416, 123 S. W. 373.

We have no such statement of facts in the instant case. The certificate shows that there was paid in $20,000, and the evidence shows that $17,550 were held by Akin, and he sold property to the corporation of practically that value. The evidence, however, shows that it was the intention of the parties when they incorporated to sell stock to others, and that when a sufficient amount of stock was sold $2,500 of the value of Akin's property was to be returned to him, and $2,500 to remain with the company as surplus, but at the time of its organization it appears that stock to the amount of $20,000 had been paid in property and money.

Mr. Magness testified: "Q. Mr. Magness, at the time this canning factory was organized, its capital stock was to be $20,000. Was that much money, or its value in property, actually put into this corporation at that time? A. It was."

This witness also testified that the value of Akin's property was established at $15,000. In addition to this value of the property Magness testified that there were $6,475 paid in.

John Baxter, a lawyer, testified that with the $15,000, value of the machinery, and the cash that was paid in, there was $21,475.

Mr. J. B. Coburn, superintendent of the canning factory of the Drew County Cottonseed Oil Mill Company at Monticello, testified that he thought he could buy similar equipment to that of the Dermott Canning Company for $4,000. In the first place, the preponderance of the evidence shows that the property put in was worth $15,000; one witness testified that after a careful consideration they reached the conclusion that it was worth that amount.

Capital stock issued for property for the reasonable value of the property is authorized, and is just as valid as if issued for money.

The other case referred to by appellants was where stock had been issued for notes, and the court held that

notes were neither property nor money, and the stock issued for notes is void. The chancellor found that the capital stock had been paid in, and his finding is not against a preponderance of the evidence.

Appellants' next contention is that the president and secretary are liable because of their failure to make and file the certificate required under § 1715 of C. & M. Digest. The evidence shows conclusively that this section was not complied with, and this section has been construed by the court several times.

This court said in construing the above statute: ''In view of the above statute, the president of a banking corporation, when he accepts the office and enters upon his duties, impliedly undertakes, if he neglects or refuses to make the annual statement, to pay all debts of the corporation contracted during the period of such neglect or refusal. The law raises the promise on his part to the creditors of the corporation that he will pay the debts of the corporation to them contracted during the period of his neglect or refusal to comply with the statute.'' *Hughes* v. *Kelley*, 95 Ark. 327, 129 S. W. 784; *Interstate Jobbing Co.* v. *Velvin*, 165 Ark. 263, 263 S. W. 966; *Culberhouse* v. *Fischer Lime & Cement Co.*, 167 Ark. 201, 266 S. W. 974.

However, in this case the complaint was filed July 9, 1927. The answer of the defendant, Magness, was filed November 15, 1929. In the original complaint there was no mention made of director's liabilities under this section. On the 19th day of February, 1930, there was an amended complaint filed alleging the liability of the directors for failure to file a certificate as required by § 1715 of C. & M. Digest.

It is contended by appellants that it is the settled rule of practice that when a court of equity obtains jurisdiction of a cause it will decide it for all purposes. That is true, but the jurisdiction of cause of action because of the failure to file the annual statement was not obtained by the chancery court.

The statute provides: "The plaintiff may amend his complaint without leave at any time before an answer is filed and without prejudice to the proceedings already had." Section 1237, C. & M. Digest.

The answer of defendant Magness, as we have said, was filed on November 15, 1929, and this amendment was filed the 19th day of February, 1930. Under the statute, after the answer filed, the plaintiff had no right to amend without permission of the court.

"The court may, at any time, in furtherance of justice, and on such terms as may be proper, amend any pleadings or proceedings by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case; or, when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved." C. &. M. Digest, § 1239.

The court, however, did not amend the pleadings in this case nor was the court's permission had before filing the amendment. Not only had the answer been filed before the amendment, but much of the proof had been taken, and it is alleged by attorneys for appellees that the first knowledge they ever had of this new cause of action was when the case was called for trial.

In discussing the question of amendments, this court has said: "The statute does not, however, require the court at all stages of the proceeding to permit the introduction of new issues in the case. That is to some extent a matter of discretion with the trial court, when the amendment does not change substantially the claim or defense, and this court will not disturb a ruling of the trial court in the exercise of that discretion when it clearly appears to have been observed." *Bluff City Lbr. Co.* v. *Hillson,* 85 Ark. 39, 107 S. W. 161.

Of course, the amendment in the instant case did change substantially the claim of the plaintiff. It was a new cause of action.

This court also said: "Under statutes like this it has been uniformly held that no amendment can be allowed after the commencement of a trial which introduces into the case a new cause of action." *Patrick* v. *Whitely*, 75 Ark. 465, 87 S. W. 1179.

The trial court has some discretion as to these matters, and unless its discretion is abused this court will not reverse. *Amer. Bonding Co.* v. *Morris*, 104 Ark. 276, 148 S. W. 519; *Kempner* v. *Dooley*, 60 Ark. 526, 31 S. W. 145; *Mooney* v. *Tyler*, 68 Ark. 314, 57 S. W. 1105.

It is next contended by appellants that the mortgage on the factory site was unauthorized and therefore void. The mortgage was executed by the vice-president and secretary, and the acknowledgment was regular and shows they had authority.

The burden of course was upon the persons attacking the validity of the mortgage to show that it was void, and that it was executed without authority. There is no evidence at all in the record tending to show this. One witness testified that he did not find any authority in the papers he examined. This does not prove, however, that the authority was not given.

It is true that wherever it is essential to prove a negative the burden is upon the party who alleges it unless the means of making the proof are in control of the opposite party. The production of the mortgage itself with the proper acknowledgment was sufficient to introduce it in evidence, and it was *prima facie* valid.

The defendants were no more in possession or control of the means of proof than the plaintiffs were. The defendants did not have the records in their possession, and both of the officers were called as witnesses and the plaintiffs did not ask either of them whether they had such authority.

But evidence of Mr. Carlisle that there were two boxes of papers at the clerk's office, records of various forms; that there were no adequate records to show the financial condition of the canning company; and that he

did not see any minute book authorizing the vice-president and secretary to execute a mortgage, was not sufficient to show that the mortgage was executed without authority.

It is finally contended that the preferences obtained by the banks should be set aside.

Section 1800 of C. & M. Digest provides among other things that no such preference shall be set aside unless complaint thereof be made within 90 days after the same is given or sought to be obtained.

The mortgage was executed on the 18th day of April, 1928, and filed for record immediately thereafter. The filing and recording of the mortgage was notice to plaintiffs as well as others, and no suit was filed until more than a year after the execution of the mortgage.

This court said in a recent case: "If this intervention, as appears to be the case from the allegations of the petition, be considered a proceeding to set aside and cancel the mortgage from the Fort Smith Spelter Company to the American Zinc Products Company as fraudulent and giving a preference to the creditors of an insolvent corporation, it must fail, as not having been commenced within 90 days after the execution of the mortgage complained of, as the law requires, since the mortgage sought to be foreclosed was recorded on June 24, 1924, as alleged in the intervention, which was not filed until October 14, 1925, more than a year after the execution and recording of the mortgage." *American Zinc Products Co.* v. *Sanders*, 175 Ark. 133, 298 S. W. 857.

We find no error, and the decree of the chancery court is affirmed.